UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FREDERICK B. HOLLIE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.  11-561 (ESH) |
| TEAMSTERS LOCAL UNION NO. 639, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Frederick Hollie has sued his former union, the International Brotherhood of Teamsters, Local Union No. 639 ("Union"), alleging that the Union breached its duty of fair representation in handling his pre- and post-termination grievances.  The Union has moved for summary judgment.  (Motion for Summary Judgment, Mar. 8, 2013 [ECF No. 27] ("Mot.").)  The Court held oral argument on the motion on June 13, 2013.  At that hearing, the Court ruled that the Union's motion would be denied.  (*See* Order (June 13, 2013) [ECF No. 30].)  This Memorandum Opinion sets out the reasons for that decision.

## BACKGROUND

Plaintiff is a former employee of the United Parcel Service ("UPS").  (Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute, Mar. 8, 2013 [ECF No. 27] ("Def.'s Facts") ¶ 1; Plaintiff's Statement of Disputed Material Facts, Mar. 29, 2013 [ECF No. 28] ("Pl.'s Facts") at 1.)  Defendant is a labor organization affiliated with the International Brotherhood of Teamsters that represents members working in the Washington, D.C. area. (Def.'s Facts ¶ 1; Pl.'s Facts at 1-2.)  At all times relevant to this litigation, defendant and UPS

were parties to a collective bargaining agreement ("CBA") that established grievance procedures for resolving workplace disputes. (*See* Def.'s Facts ¶¶ 1-2; Pl.'s Facts at 2-3.)

## I. GRIEVANCE PROCEDURES

For disputes concerning matters other than terminations or suspensions, an employee has five work days in which to file a grievance with the union shop steward, who must then present the grievance to a UPS manager. (Def.'s Facts ¶¶ 2-3; Pl.'s Facts at 5.) For terminations and suspensions, the employee has ten days in which to file the initial grievance. (Def.'s Facts ¶ 3; Pl.'s Facts at 7; Mot. Ex. 3, CBA at 192.) Once a grievance is filed, the shop steward must then attempt to set up a center-level meeting with himself, the UPS supervisor, and the grievant within 48 hours. (Def.'s Facts ¶ 3; Pl.'s Facts at 5; Mot. Ex. 3, CBA at 187.) If the grievance remains unresolved after the center-level meeting, the shop steward must attempt to set up a local-level meeting with UPS management within five days. (Def.'s Facts ¶ 3; Pl.'s Facts at 6; Mot. Ex. 3, CBA at 187.) If the grievance is still unresolved at that time, it is to be submitted in writing to the Atlantic Area Parcel Grievance Committee ("AAPGC") within ten days. (Def.'s Facts ¶ 3; Pl.'s Facts at 6; Mot. Ex. 3, CBA at 187.) The AAPGC panel consists of two or three union committee members, an equal number of employer committee members, and, in cases of discharge or suspension, an impartial arbitrator. (Def.'s Facts ¶ 4; Pl.'s Facts at 8; Mot. Ex. 3, CBA at 188, 190.)

### A. Pre-Termination Grievances

Prior to January 2009, plaintiff was a driver for UPS. (Def.'s Facts ¶ 4; Pl.'s Facts at 10.) In January 2009, plaintiff was reassigned to the pre-load department. (Def.'s Facts ¶ 4; Pl.'s Facts at 10.) On January 14, 2009, plaintiff was asked by his supervisor whether he had ever unloaded trailers in the past. (Def.'s Facts ¶ 4; Pl.'s Facts at 10-11.) Plaintiff responded that he

had previously suffered a shoulder injury while unloading trailers. (Def.'s Facts ¶ 5; Pl.'s Facts at 11.) The following day, plaintiff was told to report to Mike Kelley, the UPS manager in charge of the pre-load area. (Def.'s Facts ¶ 5; Pl.'s Facts at 12.) At that meeting, plaintiff was told that he could not work until he provided a current medical release. (Def.'s Facts ¶ 5; Pl.'s Facts at 12-13.)

On January 22, 2009, plaintiff filed a grievance challenging the requirement that he obtain a medical release before being allowed to work. (Def.'s Facts ¶ 5; Pl.'s Facts at 17.) In particular, plaintiff objected to such a requirement in light of the fact that he had previously filed multiple medical clearances with UPS. (Pl.'s Facts at 11, 17.) The next day, plaintiff spoke with Mr. Anthony Smith, a business agent from the Union. (*Id.* at 17-18.) Mr. Smith claims that he instructed plaintiff to get an updated physical. (Def.'s Facts ¶ 6.) Plaintiff, however, denies that Mr. Smith gave him such an instruction. (Pl.'s Facts at 18.) He insists that it was his idea, not Mr. Smith's, to consider proceeding with the physical, but that Mr. Smith responded only that "he would look at that option and discuss it with UPS." (*Id.*)

On January 29, 2009, plaintiff, Mr. Kelley, and Union shop steward Donna Levenberry attended a meeting. (Def.'s Facts ¶ 6; Pl.'s Facts at 19.) Defendant characterizes this meeting as a center-level meeting for purposes of addressing plaintiff's grievance (Def.'s Facts ¶ 6), while plaintiff insists that this meeting did not meet the requirements of a center-level meeting under the CBA. (Pl.'s Facts at 19-20.) At this meeting, Mr. Kelley reiterated that plaintiff's prior medical releases were insufficient and that plaintiff would need to produce a current release in order to return to work. (Def.'s Facts ¶ 6; Pl.'s Facts at 20.)

Plaintiff then began efforts to obtain the requested medical release. (Def.'s Facts ¶ 17; Pl.'s Facts at 21.) Because he could not afford a medical examination, the Union suggested that

3

he seek government assistance, so plaintiff applied for Medical Assistance from the Income Maintenance Administration on January 27, 2009.  (Def.'s Facts ¶ 6; Pl.'s Facts at 21.)

Plaintiff claims that he filed two additional grievances on February 6, 2009, regarding Mr. Kelley's failure to provide plaintiff with the paperwork necessary for his Medical Assistance application and his non-responsiveness with respect to the January 22 grievance.  (Pl.'s Facts at 23.)  The Union disputes that it ever received these grievances. (Mot. at 19 n.1.)

### B. Post-Termination Grievance

Some time prior to February 19, 2009, UPS determined that plaintiff "would be separated for unauthorized absence" based on his failure to maintain contact with his employer while he was absent from work.  (Def.'s Facts ¶ 19; Pl.'s Facts at 24.)  UPS sent plaintiff a termination notice dated February 19, 2009.  (Def.'s Facts ¶ 20; Pl.'s Facts at 24-25.)  The next day, plaintiff received notice from the post office that he had a parcel waiting for him which required his signature.  (Def.'s Facts ¶ 21; Pl.'s Facts at 25.)  The notice did not indicate who the parcel was from.  (Pl.'s Facts at 25.)  Although plaintiff was aware that UPS communicated with its employees regarding disciplinary and grievance procedures via certified mail (Def.'s Facts ¶¶ 9-10; Pl.'s Facts at 8-9), he thought the package was a replacement modem that he no longer needed, so he did not act swiftly to retrieve the package.  (Pl.'s Facts at 25-26.)  Instead, he went to the post office to retrieve the parcel on March 14, 2009.  (Def.'s Facts ¶ 21; Pl.'s Facts at 25.)  Five days later, on March 19, 2009, plaintiff submitted a grievance regarding his termination.  (Def.'s Facts ¶ 22; Pl.'s Facts at 26.)

Because the grievance related to an Article 50 discharge, the shop steward did not seek a center-level meeting, but instead sent the grievance straight to Mr. Smith.  (Def.'s Facts ¶ 22.) Mr. Smith and plaintiff discussed the grievance, but disagree as to what was said.  Mr. Smith

recalls that he told plaintiff that he should first get the requested medical clearance, and then they would try to get him his job back.  (*Id.* ¶ 23.)  Plaintiff disagrees, and insists that "Mr. Smith did not tell Mr. Hollie that he had to get a physical before Mr. Smith would set up a local-level meeting."  (Pl.'s Facts at 27.)  Instead, plaintiff claims that after a lengthy reminder about the facts underlying the grievance, Mr. Smith said only that he "would investigate" and "would look into it."  (*Id.*)  Mr. Smith and plaintiff communicated about the grievance a few more times during March and April of 2009, but then had no further contact until February 2010.  (Def.'s Facts ¶ 24; Pl.'s Facts at 28-29.)  During that time, plaintiff did make calls to several shop stewards.  (Pl.'s Facts at 29.)  In February 2010, plaintiff reached Mr. Smith on the phone and informed him that he had obtained his medical release the prior May.  (Def.'s Facts ¶ 25; Pl.'s Facts at 29.)

After hearing from plaintiff, Mr. Smith attempted to move forward with the grievance process.  (Def.'s Facts ¶ 26; Pl.'s Facts at 29-30.)  Mr. Smith tried to schedule a local-level meeting for June 2010, but it was eventually set for July 27, 2010.  (Def.'s Facts ¶ 26; Pl.'s Facts at 30.)  There is a dispute as to the reason for the lengthy delay before the meeting was scheduled.  Defendant claims that it was purely a matter of scheduling issues.  (Def.'s Facts ¶ 27.)  Plaintiff counters that local-level meetings can typically be scheduled within a month, and that the real reason Mr. Smith finally scheduled a meeting is because plaintiff filed a complaint against the Union with the National Labor Relations Board in early June 2010.  (Pl.'s Facts at 30.)  Although the parties dispute the reason why, it is undisputed that plaintiff missed the July 27 local-level meeting, and thus, the meeting was rescheduled for August 13, 2010.  (Def.'s Facts ¶ 28; Pl.'s Facts at 31-32.)  At the local-level meeting, the UPS manager denied the grievance based on his belief that the grievance was untimely and noted the lengthy delay

between the termination and the local level meeting.  (Def.'s Facts ¶ 29; Pl.'s Facts at 32-33.)  Mr. Smith then appealed the decision to the AAPGC panel.  (Def.'s Facts ¶ 30; Pl.'s Facts at 33.)

At the AAPGC meeting, UPS raised a "point of order" regarding the timeliness of plaintiff's grievance.  (Def.'s Facts ¶ 32; Pl.'s Facts at 34.)  The issue arose from the fact that plaintiff had not filed his termination grievance until March 19, 2009, a full month after the termination letter was issued on February 19, 2009.  (Def.'s Facts ¶ 32; Pl.'s Facts at 34.)  The Union stated on plaintiff's behalf that plaintiff had filed the grievance within five days of the date he picked up the letter and became aware of the termination.  (Def.'s Facts ¶ 33; Pl.'s Facts at 35.)  The panel discussed the issue and eventually sustained the point of order so that the grievance was denied on timeliness grounds, and the panel declined to reach the merits.  (Def.'s Facts ¶ 36; Pl.'s Facts at 36.)

## ANALYSIS

### I.     SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  There is a genuine dispute as to a material fact if a "reasonable jury could return a verdict for the nonmoving party."  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248).  A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Waterhouse v.*

*District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  However, the non-moving party "may not rely merely on allegations or denials in its own pleading," *see* Fed. R. Civ. P. 56(c), but instead must offer specific facts showing that genuine issues exist for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   DUTY OF FAIR REPRESENTATION

A union has a statutory duty to fairly represent all employees in enforcement of the CBA. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).  A union breaches that duty "if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (quoting *Vaca*, 386 U.S. at 190).  Plaintiff here argues only that the Union's conduct was arbitrary.  (*See* Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment, Mar. 29, 2013 [ECF No. 28] ("Opp'n") at 14.)  This is undeniably a high bar; unions are entitled to a "'wide range of reasonableness'" in performing their duties.  *Air Line Pilots Ass'n*, 499 U.S. at 78 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)).  Thus, "mere negligence" does not constitute a breach of the duty of fair representation.  *Brown v. Gino Morena Enters.*, 44 F. Supp. 2d 41, 45 (D.D.C. 1999) (collecting cases).  Rather, union conduct will be considered arbitrary only if "the union's behavior is so far outside a wide range of reasonableness as to be irrational."  *Air Line Pilots*, 499 U.S. at 67 (internal quotation marks and citations omitted).

"The crucial elements for a claim of arbitrariness are that the union's error involved a ministerial rather than judgmental act, that there was no rational or proper basis for the union's conduct, and that the union's conduct prejudiced a strong interest of the employee." *Watkins v. Commc'ns Workers of Am., Local 2336*, 736 F. Supp. 1156, 1161 (D.D.C. 1990) (citing *NLRB v. Local 282*, 740 F.2d 141, 147 (2d Cir. 1984)).

### A.     Pre-Termination Grievances

Plaintiff argues that the Union breached its duty of fair representation by failing to process his pre-termination grievances. (*See* Opp'n at 14-17.) Defendant insists that plaintiff's claims regarding his pre-termination grievances are barred by the statute of limitations (Mot. at 25-27), and that even if those claims were timely filed, the Union is entitled to summary judgment. (*Id.* at 19-23.)

#### 1.     Statute of Limitations

A six-month statute of limitations applies to claims against a union for breach of the duty of fair representation. *George v. Local Union No. 639, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., ALF-CIO*, 100 F.3d 1008, 1014 (D.C. Cir. 1996). The six months begin to run when the claimant "discovers, or in the exercise of reasonable diligence should discover, the acts that form the basis of his claim." *McConnell v. Air Line Pilots' Ass'n, Int'l*, 763 F. Supp. 2d 37, 41 (D.D.C. 2011). When a series of actions allegedly violated the duty of fair representation, the "timeliness of the action is generally measured from . . . when the employee knows or should have known of the last action taken by the union which constituted the alleged breach of its duty of fair representation." *Watkins*, 736 F. Supp. at 1159. Thus, plaintiff's cause of action accrued as of the time that he knew or should have known that the grievance process had "reached a final breakdown." *Id.* at 1160.

"The matter of when a cause of action accrues is normally a question of fact, and a dispute as to the timeliness of the suit generally precludes summary judgment." *Id.* at 1159 (internal citation omitted); *see also Carney v. Am. Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998) (noting that the question of when plaintiff's claim accrued "amounts to a disputed issue of material fact that the district court should resolve at trial").

This Court previously ruled on the timeliness of plaintiff's claim in addressing defendant's motion to dismiss. *See Hollie v. Smith*, 813 F. Supp. 2d 214, 219-20 (D.D.C. 2011). The Court declined to find that plaintiff's claim was untimely because plaintiff had sufficiently "alleged that he reasonably thought that the grievance process had not reached a final breakdown prior to the October 2010 hearing," and he had filed his complaint within six months of that hearing. *Id.* at 220.

Defendant argues that, at least with respect to the pre-termination grievances, the Court should now reach a different conclusion. (Defendant's Reply in Support of Its Motion for Summary Judgment, Apr. 9, 2013 [ECF No. 29] ("Reply") at 13.) Specifically, defendant points out that plaintiff is now represented by counsel (and so can no longer benefit from liberal construction) and argues that the discovery conducted during the pendency of this case demonstrates that plaintiff knew at least as of February 2010 that the Union was not processing his pre-termination grievances. (*Id.*) In support of this position, defendant points to an excerpt from plaintiff's deposition, in which he acknowledged that when he spoke with Mr. Smith in February 2010, he became "aware that the pre-termination grievances were not being processed." (Mot. at 27 (citing Mot. Ex. 1, Hollie Deposition ("Hollie Dep.") 110-11).) This, defendant insists, shows that plaintiff's claim with respect to the pre-termination grievances accrued in February 2010 and had long-since expired when he filed his complaint in February 2011.

Plaintiff, for his part, denies that he believed the grievance process had reached a final breakdown at that point. He argues that "[t]he facts and circumstances giving rise to [the pre-termination] grievances are inextricably linked to Mr. Hollie's February 19, 2009 termination" and the resulting grievance because the question of whether UPS had just cause to terminate him for unauthorized leave (the subject of the post-termination grievance) turns in part on why he was told not to return to work in the first place (the subject of the pre-termination grievances). (*See id.* at 24-25.) Thus, he insists that "it was entirely reasonable for [him] to expect that he could still receive relief from Mr. Kelley's order [that he provide a current medical release] by virtue of the AAPGC decision." (*Id.* at 25.)

The Court cannot conclude as a matter of law that plaintiff was untimely in bringing his claim with respect to the pre-termination grievances. First, there is a genuine factual dispute as to what plaintiff actually knew and when. His deposition testimony does not resolve the matter. The mere fact that plaintiff knew the Union was not doing anything to process his grievances as of February 2010 does not establish that he knew they would not do so in the future. And furthermore, plaintiff alleges that he believed the local-level meeting and the AAPGC panel meeting related to *all* of his grievances, and therefore the grievance process had not reached a *final* breakdown until after that point.

Second, the Court cannot conclude as a matter of law that plaintiff *should have known* the grievance process had reach a final breakdown as of February 2010 based on the record before it. To be sure, plaintiff's subjective view that the local-level meeting and the AAPGC panel meeting related to his pre-termination grievances, as well as his post-termination grievance, may have been incorrect, given that the Union's written submission to the AAPGC panel mentioned only the March 19, 2009 termination grievance. (Mot. Ex. 14.) However, that fact does not

definitively establish that plaintiff's understanding to the contrary was unreasonable. For one thing, plaintiff claims that he never received a copy of the materials submitted by the Union to the AAPGC panel (Pl.'s Facts at 33), and regardless, those materials may well have been submitted within the six-month statute of limitations window, such that even if he should have known that his grievances had been abandoned at that time, his complaint would nevertheless have been timely filed.[1] For another, there is little evidence before the Court as to precisely what issue was addressed at the local-level meeting, so the Court cannot conclude as a matter of law that plaintiff should have known that his pre-termination grievance was not being pursued at that time. And finally, it should be left to the fact-finder to determine whether plaintiff's grievances were so factually intertwined that it was reasonable for him to conclude that the local-level and AAPGC meetings did, in fact, relate to his pre-termination grievances even if they did not do so explicitly.

Ultimately, it is simply "not beyond dispute" that plaintiff knew or should have known that the grievance process had ended in February 2010. *Watkins*, 736 F. Supp. at 1160. That question therefore cannot be decided on a motion for summary judgment.

### 2. Breach of Duty

Having determined that the Court cannot declare plaintiff's claims with respect to his pre-termination grievances untimely, the Court must now consider whether to grant summary judgment on the merits of those claims.

---

[1] The facts before the Court at this point establish only that the AAPGC panel meeting materials were submitted sometime after the local-level meeting on August 13, 2010, but before the AAPGC meeting on October 20, 2010. (*See* Pl.'s Facts at 32-33.) Because plaintiff's complaint was filed on February 18, 2011, the six-month statute of limitations window extends back to August 18, 2010, and therefore includes most of the relevant date range.

11

The Court concludes that it cannot grant defendant judgment as a matter of law on this question because there are factual issues that cannot be resolved without making credibility determinations.

According to defendant, Mr. Smith thought that plaintiff had told Mr. Kelley he could not perform the work, and believed that under those circumstances "UPS's actions were justified." (Def.'s Facts ¶ 15.)  Thus, Mr. Smith's reasoned determination not to pursue plaintiff's grievance was an exercise of "judgment," rather than simply a "ministerial" act, as required for a finding of arbitrariness.  (Mot. at 19-20 (citing *Watkins*, 736 F. Supp. at 1161).)  Defendant further insists that when plaintiff and Mr. Smith discussed plaintiff's January 22, 2009 grievance, Mr. Smith "instructed Mr. Hollie to obtain a medical release," relying on the well-established principle of "work now, grieve later," under which an employee should do as he is instructed by his employer (so as to avoid discipline for insubordination) and challenge the legitimacy of that order later. (*See* Def.'s Facts ¶ 16; Mot. at 24-25; Reply at 4-6.)  *See, e.g.*, *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (7th Cir. 1997) (finding Union was "not irrational but rather was reasonable" in deciding to drop plaintiff's grievance where plaintiff had "violated the 'obey now and grieve later' rule generally applied in arbitration proceedings"); *Reynolds v. Wash. Tug & Barge Co.*, 1980 WL 2185, at *2 (W.D. Wash. Nov. 3, 1980).

However, plaintiff disputes that defendant in fact relied on such a policy.  Plaintiff says that he did not tell Mr. Kelley he was incapable of performing the work, nor did he tell Mr. Smith that he had said any such thing to anyone at UPS.  (Pl.'s Facts at 15.)  Additionally, plaintiff claims that Mr. Smith did not tell plaintiff that he should get the medical release.  (*Id.* at 18.)  Instead, plaintiff asserts it was he who raised the option of getting the physical, and that Mr. Smith simply "said he would look at that option and discuss it with UPS."  (*Id.*)  Plaintiff further

12

alleges that, contrary to that statement, Mr. Smith "did not investigate the January 22 grievance and did not contact UPS in any way about the grievance." (*Id.* at 21.)[2]

The discrepancy between what plaintiff and Mr. Smith recall about their meeting means that summary judgment cannot be granted. Construing these fact in the light most favorable to plaintiff, the Court cannot conclude that the Union made a rational decision not to pursue plaintiff's pre-termination grievances. If indeed Mr. Smith did no more than say he would look into the matter and then fail to do so—as plaintiff alleges—such inaction could give rise to liability for a breach of the duty of fair representation. *See, e.g.*, *Miller v. Gateway Transp. Co.*, 616 F.2d 272, 277 n.11 (7th Cir. 1980) ("A union also breaches its duty when it arbitrarily ignores or perfunctorily processes a grievance."); *Minnis v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 531 F.2d 850, 854 (8th Cir. 1975) (noting that the union did not conduct "even a limited investigation," but instead "agreed to represent [the plaintiff] and then failed to make any effort actually to do so and finally dropped the grievance without notifying [him] for almost six months"); *Gorwin v. Local 282, I.B.T.*, 1997 WL 151043, at *8 (S.D.N.Y. Apr. 1, 1997) ("From this evidence, a jury could reasonably conclude that the Union breached its obligation of fair representing by failing to conduct an adequate investigation into the veracity of Testwell's charges against [the plaintiff].").

As plaintiff's counsel acknowledged at the oral argument, for plaintiff to succeed on his pre-termination claim he would still need to establish that the outcome of his grievance would have been different—that is to say, that he would not have been terminated—had the Union properly pursued his grievance to the local level. However, there is undeniably a genuine

---

[2] In its Reply, defendant purports to "assume[] the facts as stated by Plaintiff to be true." (Reply at 1 n.1.) However, large portions of defendant's Reply are premised on the application of the "work now, grieve later" policy, which plaintiff disputes was ever invoked by the Union to justify its failure to process his pre-termination grievances.

dispute as to that material fact as well. Plaintiff's counsel pointed to deposition testimony tending to show that grievances are routinely resolved at the local level, that Mr. Smith was quite effective at reaching resolutions, and that Mr. Kelley was reasonable and typically resolved grievances without resorting to the AAPGC panel, while defense counsel argued that the likelihood of Mr. Kelley changing his mind at the local level was low in light of the numerous times he had previously insisted that plaintiff provide the contested medical clearance. Ultimately, the Court concludes that a reasonable jury could find in either party's favor, and thus cannot grant summary judgment.

Additionally, there is a fundamental dispute as to whether plaintiff ever successfully filed the two February 6, 2009 grievances. (*Compare* Opp'n Exs. P, R (copies of Feb. 6, 2009 Grievance) *with* Mot. at 19 n.1 ("The Union disputes that the February grievances produced by Mr. Hollie in discovery were properly submitted or filed by Plaintiff.").) Without further factual development, the Court cannot resolve whether the Union's inaction with respect to those grievances constituted a breach of its duty of fair representation.

### B.   Post-Termination Grievance

While defendant's arguments in favor of summary judgment are more compelling with respect to plaintiff's claim regarding his post-termination grievance, they ultimately must be rejected due to factual disputes.

Defendant argues first that plaintiff's claim fails as a matter of law "because he was not prejudiced by the Union's alleged inaction." (Reply at 11.) This argument is based on the fact that the AAPGC never reached the merits of plaintiff's grievance because it found he had been untimely in filing his initial grievance—a fact that preceded the Union's involvement in the grievance process. (*Id.* at 12.) Thus, defendant insists that plaintiff cannot show how the

Union's handling of his grievances "prejudiced a strong interest" of his. *Watkins*, 736 F. Supp. at 1161.

At the AAPGC level, defendant is correct. Plaintiff does not dispute that his claim was ultimately denied because he did not file his post-termination grievance until one month after the date of the termination letter. (Pl.'s Facts at 26.) Thus, nothing the Union did in processing plaintiff's grievance once it was filed can be blamed for the eventual outcome of the AAPGC meeting.

However, the same cannot be said at the local level based on the undisputed facts currently before the Court. Defendant states simply that at the local-level meeting, "the UPS manager denied the grievance." (Def.'s Facts ¶ 29.) Plaintiff adds that the grievance was denied based on the manager's "understanding that the grievance was untimely and that Mr. Hollie had not contacted UPS since his February 19, 2009 termination." (Pl.'s Facts at 32-33, citing Opp'n Ex. V, handwritten notes of Randy Roberts.) At the very least this evidence creates uncertainty as to whether the grievance was denied because of the "timeliness" of its initial filing or because of the "timeliness" of pursuing the grievance to the local level. If the latter, there is a further dispute as to which party is responsible for the delay.

Defendant insists that the Union clearly indicated that plaintiff needed to get an updated medical clearance before the Union would pursue his grievance any further. Thus, it asserts that the delay between plaintiff's termination and February 2010, when he notified the Union that he had obtained an updated medical release, is attributable to plaintiff. Plaintiff claims, on the other hand, that the blame for the delay rests with defendant. First, he claims he was told only that the Union would "investigate" his case and then heard nothing further from them. (Pl.'s Facts at 27.) Second, he offers evidence that he did attempt to contact numerous Union shop stewards in

May, July, and August of 2009 and January of 2010. (*Id.* at 29.) Third, plaintiff complains that Mr. Smith did not manage to schedule a local-level meeting until July 2010, a full five months after plaintiff first told him that he had obtained an updated medical release. (*Id.* at 30-31.) Construing this evidence in plaintiff's favor, the Court concludes that, even though plaintiff's argument can be characterized as speculative and he may face a difficult evidentiary burden, a reasonable jury could find that plaintiff's grievance was denied at the local level because of the Union's failure to schedule a local-level meeting in a timely manner, and, as discussed above, that his grievance would have been favorably resolved on the merits at the local level.

Moreover, the evidence is unclear with respect to whether any such delays by the Union were "ministerial" rather than "judgmental" acts.[3] Although defendant insists repeatedly that its inaction resulted from a reasoned determination that plaintiff could not be successful on his grievance without an updated medical clearance, plaintiff's recollection of the events contradicts this explanation. (*See supra* at 4-5.) Moreover, the Union has offered no explanation aside from "scheduling issues" to explain why it took more than five months to schedule the local-level meeting, despite plaintiff's evidence that it typically took "less than a month" to schedule a local-level meeting when the grievance related to an Article 50 discharge, as was the case here. (Pl.'s Facts at 30.) Even if defendant is correct that it may seek shelter in its application of the "work

---

[3] Defendant insists that it cannot be held liable for unfair representation based on the delay in scheduling a local-level meeting because a union can reasonably rely on "a prevailing practice of freely granted extensions." (Reply at 11.) That rule was first articulated by the Sixth Circuit in *Ruzicka v. General Motors Corp.*, 649 F.2d 1207, 1211 (6th Cir. 1981), and was relied on by this Court in *Watkins*, 736 F. Supp. at 1161. However, that rule is not dispositive here. Mr. Smith's deposition testimony does show that he generally believed there was flexibility in scheduling local-level meetings. (*See* Reply Ex. 1, Smith Deposition Excerpts). However, in light of the sixteen-month delay between the filing of the initial grievance and the first scheduled local-level meeting, that testimony is insufficient to rebut plaintiff's evidence that the Union generally tried to schedule a local-level meeting for an Article 50 discharge in less than a month. (Pl.'s Facts at 30.)

now, grieve later" policy from a legal standpoint, it must first establish that it in fact relied on that policy. Given the dispute as to that issue, the Court cannot determine as a matter of law that defendant was simply exercising its judgment in declining to pursue plaintiff's post-termination grievance.

## CONCLUSION

For the foregoing reasons, the Union's motion for summary judgment is DENIED.

___/s/___
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  June 14, 2013